Next matter is Zirpoli v. Midland Funding. May it please the Court, my name is Mary Zirpoli, and I'm here on behalf of Zirpoli v. Midland Funding. My name is Lauren Marshall Burnett with the firm of Messer Strickler Burnett. I represent the appellant, Midland Funding, LLC, and I have reserved two minutes of rebuttal. Thank you. I'm sorry. I have a cold, too, so I'm pretty much just a mess today. You're just a mess, aren't you? Your Honors, this appeal arises under the Federal Arbitration Act, and more specifically from the district court's denial of Midland Funding's motion to compel arbitration and stay proceedings pending the outcome of that arbitration. And yes, this is to me. If there is a valid agreement to arbitrate between Mr. Zirpoli and your client, this thing gets really simple. And then from there on, it's up to the arbitrator to decide any of the merits or any of the disputes. So the real issue is whether there is an agreement to arbitrate. Speaking only for myself, when I first looked at the case, my analysis was that there wasn't because your client didn't have a license or permission. So therefore, the assignment that was taken from the initial lender was invalid. Since then, it's been made clear from the Secretary of Banking, I guess, that the statute, the CDCA, does not apply to entities that are not in the business of lending, that only deal with charged-off debts, which is your client. Therefore, the CDCA would not apply here. And that seems to end it. Well, then, goodbye. Thank you. I'm only one vote for the prohibition against the prohibition which would prohibit the arbitration agreement from attaching to your client. Isn't that an obstacle? Because that, which I thought was the obstacle, doesn't bother your client. You're correct, Your Honor. And you're referring to the Department of Banking letter from the Lutz versus Portfolio Recovery Associates case. That's correct. And I'd be more than happy to go down the rabbit hole of when a loan ceases to be a loan and the difference between performing and non-performing. I don't think there's any dispute here. Well, the loan is clearly being non-performing. I guess there is an argument as to whether or not a non-performing loan is still a loan under the CDCA. But then we go back to the letter that was submitted, and I think we have to defer to that. It's clear that it's not. And forgive me, I don't have the page number of the Department of Banking's letter at hand. But in the letter that it submitted in the Lutz case, it explicitly said it is no longer a loan because it has been charged off and is no longer performing and has been sold as is to the S&E. So because it's no longer a loan, the statute doesn't apply? Beg your pardon? Because it's no longer a loan, the statute no longer applies. That's correct. That's correct. It ceases to be a loan. I'm going to take a step back. The CDCA was primarily intended to limit the add-ons that can be put onto a small dollar loan, origination fees, finder's fees, you know, all these other things that kind of get tacked on. So at a certain point when that loan is, you know, X number of months out from the last payment and it's no longer performing and it's charged off and sold, then we no longer have that risk of ancillary add-ons that are made at the time of the act of lending, for lack of a better description. Your license isn't, you know, a license to extend high-value, high-interest, small-value loans. So it's not the right kind of license, quote, under this act. To that I would say that Midland Funding is not extending loans or negotiating credit or offers of credit or loans of money. So Midland Funding, if you take a step back, doesn't fit within the rubric of the CDCA at all, because as the Department of Banking said, an entity that acquires a charged off and closed loan, and I think that there's no dispute that Mr. Zerpeli had long since ceased making payments on the loan, is not, it doesn't fit that threshold definition of a CDCA-governed entity. And so its conduct falls outside the scope of the statute. Well, I'm not sure about that. But, okay, we have the, you say, well, maybe we can't, because there's this whole issue as to whether one may, you know, if one main is the one who's licensed to hang on to these loans, then Zerpeli would then still owe the debt to one main and, you know, wouldn't have been assigned to Midland. They have the valid license for this kind of lending. You're correct. They have the valid kind of license for this lending, and they are the entity that did the lending. The CDCA, though, is silent as to what happens when that loan ceases to perform, when the obligor ceases to make its payments and the loan is charged off and closed. If you look at the language that the statute employs, and we have to look at the statute as a whole, the aim of the statute preventing these excessive add-ons and excessive interest rates are discussed in real time. They're not discussed in the context of a loan that has been charged off and shut down and is no longer having payments received. It's no longer accruing interest. It's no longer accruing any of these fees. So the language of the statute itself, when you look at it as a whole, it limits the entities that can negotiate these types of loans, that can extend these types of loans. I would agree with Your Honor that it regulates the types of entities to whom a loan, a performing loan, can be sold. But that's not what Midland Funding bought. Midland Funding... Do that at all? Does Midland Fund do any lending at all? Or is it engaged in the business of collecting loans that are still performing, that are current? No, we're actually... So Midland Funding is, you know, just the colloquial term, Midland Funding is a debt buyer. It purchases charged off loans, credit card loans. I've been in front of Your Honor on one of those cases before. And in this instance, it purchased these small dollar loans originated by one main. It does not purchase any loans that are not in default, that are not charged off, and that have not been sold. Explain to me what I make of Pennsylvania Statute Section 6214.I. A licensee may not sell contracts to a person or corporation not holding a license under this Act without the prior written approval of the Secretary of Banking. You don't have the prior written approval of the Secretary of Banking. That's correct. And you don't have a license under this Act for extending high-interest, small-value loans.  Then this assignment is prohibited by the statute. Well, so I say two things to that, Your Honor. One, I obviously disagree, and we went into a little more depth in our briefing. And then, as Judge McKee pointed out, the Department of Banking chimed in and suggests, did not touch on this point explicitly, and I don't want to represent that it did, but suggested that there is a difference between the sale of a performing loan and the sale of a non-performing loan. You're buying debt. Beg your pardon? You're buying debt. Correct. You're not buying a loan. That's your position. Correct. Correct. And I don't derive that from thin air. I derive that from the Department of Banking's own statement that a loan that is no longer performing is no longer a loan in the traditional sense. It's now – I hate to call it a receivable because I think that that implies that it's less than it is, but it's really distilled down to a balance on a balance sheet. Yes, Your Honor. It seems like a fancy way of re-denominating what's an assignment. But I want to spend some time talking about arbitration. First of all, Zerpoli says you're not a party under the Arbitration Act. Yes. So what's the right way to understand this? Does party mean a party to the agreement to arbitrate or a party in litigation? Well, in this case, I think Midland Funding is both. And so when you – let's start with the statutory text because that's the first argument that Mr. Zerpoli raises, that the FAA, when it uses the term party, intended only a party to the arbitration agreement. And I think a couple of things about that. I think, number one, that that goes against a huge body of case law within this circuit and elsewhere that recognizes that contractual obligations can be assigned. Okay. But let's assume we think there's a problem with assigning this. Sure. Okay. Then you have to show the party to litigation suffices under the statute. That's correct. And I think that if you look to the language of Section 4, and we can talk about that in a moment if Your Honor would like, but Section 4 talks about this mechanism for compelling arbitration. It uses the term petition, which was addressed at length in our brief. When you, again, read that entire section as a whole, that section makes very, very clear that it goes to the commencement of a proceeding by which the aggrieved party asks the court to compel arbitration. Right. And that's the way that Section 3 was read in Arthur Anderson. Right. But let's say you're right on that. You think that this is a dispute over arbitrability, but Rent-A-Center understands arbitrability, you know, this is whether an agreement covers a particular controversy. But I'm not sure this dispute is in the arbitration agreement at all. I'm not sure it's a claim pursuant to the loan agreement. It's a claim pursuant to the separate assignment contract. So is this a claim pursuant to the loan agreement at all that's covered by the arbitration? It absolutely is, and I think that if Your Honor looks at the agreement itself, that it becomes very, very clear because the definition of claims is quite broad. It's the note, this agreement, or the enforceability or the arbitrability of any claim pursuant to this agreement. And I would submit that it's impossible to divorce the note from Mr. Zerpoli's claims because without the note, we have no interest rate. Okay. But let's say you're right that, you know, that this is under the agreement. But you have to show it's clear and unmistakable that this agreement lets the arbitrator decide who counts as an assignee. Right? If there's ambiguity, we root for Mr. Zerpoli. But arbitrability of a claim, that phrase, appears to go to whether the claim falls within the scope of the arbitration agreement, not who falls within the scope of the arbitration agreement. How does that clearly unmistakably give this decision to the arbitrator, not to the court? So to that, I say a couple of things. And I recognize that Your Honor has already said, what if we find that there's an issue with the assignment? So to that, I would say that's putting the cart before the horse, which is the error that the district court committed. It began with the legality of the assignment agreement in order to work its way backwards to determine whether a valid agreement to arbitrate existed. And instead, where we start, and the Supreme Court framework on this point, makes it very, very easy for us to walk through this analysis. Where we need to start is with the language of the arbitration agreement itself. Does an agreement to arbitrate exist? I would suggest that there's nothing less clear and unambiguous than someone's signature on a contract. And the contract says two important things. First, when it talks about we and us and our, it is not just talking about one main. It's talking about a whole class of persons. That class of persons includes assinees. It doesn't say valid assinees. It doesn't say legal assinees. It just says assinees. So recognizing, again, what Your Honor said about the legality of the assignment. But from there, when you move on to the second page of the agreement, and for your reference, this is at pages 82 and 83 of the appendix, we have two things. We have a severability provision, and we have a delegation provision. And the delegation provision specifically says that any issue regarding the note, the agreement, the enforceability, the arbitrability of a claim goes to the arbitrator in the first instance. And so we have several things here. We have the fact that Mr. Zerpily signed an agreement to arbitrate any claim arising from the note, the agreement, or the enforceability or arbitrability of any claim pursuant to this agreement. Assigned with OneMain. With OneMain and its assinees. And he does not dispute that that agreement exists. Nor does he dispute that there exists an assignment agreement from OneMain to Midland Funding. His dispute is with the legality of that agreement, but not with its existence. Is this really a dispute? Well, we go back to this. Is it really pursuant to this agreement? And you're saying because it recognized assignees, therefore, we should let it referral to the separate assignment contract. Well, and I'm out of time, but if I can answer Your Honor's question. What I'm saying is that we have to read the contract as it's written. And that's what the FAA instructs us to do. And this contract that Mr. Zerpily signed, and I have to say that in the context of charged-off consumer debt, this is something of a unicorn, that we actually have a wet ink signature on a contract. Because with credit card agreements and CLCCRAC agreements, so often now it's checking a box. But Mr. Zerpily signed this agreement. By signing this contract, he is deemed to have read its terms and agreed to them. And the contract does not limit claims that should be arbitrated to only those claims as against OneMain. It includes claims against assignees. And by attacking the validity of the assignee, Mr. Zerpily is taking no issue with the arbitration agreement itself. He's challenging an ancillary side contract. And under the framework started by Renner Center and all the way up to Henry Schein, where the district court should have stopped, is with the existence of these agreements to arbitrate and to delegate the threshold issue of whether Midland funding can validly enforce this agreement to the arbitrator. I'll step back and hold the rest. Thank you. Thank you. Ms. Gilbride? Good afternoon. May it please the court, Carla Gilbride from Public Justice on behalf of Benjamin Zerpily. Ms. Gilbride, you've heard, I'm sure, my exchange with Ms. Burnett. Why am I wrong in doing this dispute that way? I'm sorry, I didn't hear the question. Why am I wrong in looking at this in terms of a limitation on assignments, which you're saying precludes the arbitration agreement from being enforced because they didn't have a license under the CDCA and, therefore, the initial, the thing that we have to look to and that is whether or not there was an arbitration agreement. There isn't one because they weren't legally entitled to enter into the contract. But that goes out the window if they're not bound by the CDCA and, therefore, the arbitration agreement would still be binding on them. Why is that wrong? Understood. So your question, Judge McKee, is about the CDCA and whether it applies to this contract. I have four responses to that. First of all, the inquiry doesn't begin with whether Midland funding is regulated by the CDCA. The question begins with whether the contract that Mr. Zerpily entered into with one name is regulated by the CDCA. And there's no dispute in the record that it is. The interest rate exceeded 6% and the original lender, one name, had a license under the CDCA to make that sort of loan. And so where we then need to look is, as Judge Bevis said, Section 6214I, which discusses one name's prohibition as a licensed lender under the CDCA from selling that contract to a non-licensed entity, Midland Funding. That was the CDCA violation at issue here. That is what makes the assignment invalid. A second point, and this is responsive to the Department of Banking letter. Can I interrupt you for one second? Counsel is representing to us that it wasn't a loan, it was paper, it was a debt that they sold. Does that change your analysis at all? It does not, Judge Restrepo, because I was, I think, careful in discussing what 6214I says. It does not say the word loan. It says the word contracts. And if you look in the definitions section of the CDCA in 6202, contract is defined as any form of negotiable or non-negotiable instrument, evidencing an agreement to pay a sum certain. So it's nothing about loan. It's nothing about whether it's performing or whether it has, whether payments have ceased to be made. And if I could turn to what the Department of Banking said in its letter, in the LUTs versus Portfolio Recovery Associates Docket Entry 47, page 2, it talks about whether the CDCA applies to charged-off debts originating outside the scope of the CDCA by national banks. The facts of LUTs involved a credit card loan that was originated by a non-CDCA lender. And so when you look at what the Department of Banking was saying, what questions it was answering from the panel in LUTs, it was asking whether a loan under 6203, if it was originated outside the scope of the CDCA by an otherwise regulated national bank, does it become governed by the CDCA when a debt buyer purchases it? So we have very different facts here. We have a contract that originated within the scope of the CDCA, originally made by and held by a CDCA licensee. And one of the obligations that that CDCA licensee, one main had, was not to sell that contract, whether performing or otherwise, to a non-licensed entity. One main violated that provision of the statute when it purported to sell the contract to Midland. And according to Pennsylvania Supreme Court authority in American Association of Meat Processors versus Casualty Reciprocal Exchange and the Dipple case from 1950 cited there, if a contract requires violating a provision of a statute, and that's what happened when one main sold or purported to assign the contract without, to an unlicensed entity without Department of Banking approval, it could only do that, that contract could only come into existence by violating 6214I, such an invalid assignee is illegal and void ad ab initio. There was never a valid assignment. And without an assignment, there was never an agreement to arbitrate that came into existence. I don't understand your last point there. I don't want you to run through the entire thing again, but I want to make sure I understand exactly what you're arguing. I think, and tell me if I'm wrong, I think you're saying that because the contract itself was subject to the CDCA, it doesn't lose that aspect of what it is simply because somebody who may not be covered by the CDCA purchases the contract. The nature of the contract remains the same, and it is still covered by the CDCA, even if the purchaser being someone who only purchases debt and therefore doesn't deal with loans, if we can see that for a second. Nevertheless, the contract and the assignment clause within it is still binding under the CDCA. Is that basically what you're saying? Yes, and I had four answers. I think I've gotten out two. Okay. Let me get to three or four quickly. I want to make sure I understand the first and second. You've gotten one and two exactly right. Okay. So basically, what matters for purposes of our CDCA analysis, which is similar to what the district court did, is you follow the contract and the originator of the loan. Here, the originator of the loan, one main, the lender who entered into the note with Mr. Zerpulli, was regulated by the CDCA. The loan was regulated by the CDCA. And so the violation occurred when that CDCA-covered contract was purportedly assigned to a non-licensee without the Department of Banking's approval. So that was kind of the initial. And if you look at the Department of Banking's statement or letter in the Lutz case, that case was dealing with what happens if the loan originates outside the CDCA. In our view, the Department of Banking did not take a position on this fact pattern about what happens when the loan originates within the CDCA and is then purported to be assigned by a licensee. The third point I wanted to make is that opposing counsel was talking about contracts that are non-performing somehow fall outside the scope of the statute. If you look at the plain text of 6213P of the CDCA, it talks about one of the things that licensees can recover are court costs and attorney's fees associated with collecting contracts in default. So certainly the CDCA contemplates non-performing contracts, loans where payments have ceased to be made, falling within the scope and licensees having rights with respect to such non-performing contracts. So it's just an atextual reading to say non-performing contracts somehow fall outside of the scope. And the last thing I would say, to the extent that the Department of Banking letter is relevant here, and I don't think it is for the reason I said, that was a case involving an outside the scope loan, and this is a case involving a CDCA loan. But to the extent that the Department of Banking letter is relevant, this court, federal courts, give the same amount of deference to agency analysis that a state court would give. And that's the Township of Bordentown, New Jersey, versus Federal Energy Regulatory Commission, 903F3234, stands for that proposition. And I'm citing these case names because this actually wasn't in our briefs, but it is in the docket in the Lutz case, where this Department of Banking letter was discussed in more depth. But there are several cases in the Lutz response to the Department of Banking letter that talk about why the Department of Banking should not be given deference. If the unambiguous text of the statute is at odds with the approach that the agency takes, then the Crown Castle NG East versus Pennsylvania Public Utilities Commission case from the Pennsylvania Supreme Court says, you follow the unambiguous language of the statute. You don't follow the agency interpretation. Could I ask you to spend a little bit of time on the Arbitration Act and arbitrability issues here? Your position is that Zerpoli, that arbitration under Section 4, jurisdiction is limited to those who are parties to the agreement to arbitrate, and that it can't mean parties to litigation because the case hasn't, petition hasn't been filed yet in the first place. But, you know, Arthur Anderson says it's the parties in the first place. Parties means litigants under Section 3, and we would expect it to mean the same thing in Section 4 of the same act that it means in Section 3. So are you contesting that point, that as a party to the litigation, Midland can, there's jurisdiction here? Yes, we are contesting that point. Certainly this Court doesn't need to resolve the appeal on jurisdictional grounds because the Court could also affirm the district court's analysis that no arbitration agreement ever came into existence. We have an obligation to satisfy ourselves in our own jurisdiction. And I stand by all the arguments we made in the brief. I just wanted to make it clear that they are independent bases for finding that Midland is not a party. Arbitrability, we, you know, is this an arbitrability question? Midland says it is about whether the agreement covers this controversy. You say it's not. I would point this Court to the MZM Construction Company versus New Jersey Building Laborers case for the answer to that because there are certain threshold questions about whether a contract ever came into existence that are non-delegable. And this is such a question because whether there, yes, there is an agreement between Mr. Zerpoli and OneMain, and we're not disputing that. Ms. Burnett is correct. But if there were an agreement to arbitrate between Judge Bibas and Judge McKee and no one disputed the existence of that agreement, that doesn't give Judge Restrepo the right to come in and into court and enforce the agreement between two other people and say, well, there's no dispute that there's an agreement. The agreement has to be formed between specific parties. There are no such things as sort of abstract agreements to arbitrate. There is an agreement to arbitrate in this case between Mr. Zerpoli and OneMain. There's no agreement. But if the contract I have with Judge Bibas includes an arbitration clause as broad as this one where he agrees to arbitrate any dispute with any assinees, then Judge Restrepo could step in, couldn't he, under your scenario? If there is no, if the purported assignment to Judge Restrepo was not valid, then he could not step in because he would not be an assinee. I mean, there is a bit of a form over substance argument here to say that if the arbitration clause says it covers agents and then a party comes in and says, I'm an agent, is the court to take that party's word for it? And so, well, they say they're an agent, so I guess they are. We're going to send it to the arbitrator. I think there has to be more of an inquiry if you look at what Section 4 requires, which is that the court be satisfied that an agreement exists, an agreement between these particular parties exists. And that's what this court said in MZM Construction, that in order to be satisfied, that does require looking at the existence of the larger contract. And that can't be delegated because it's the court's responsibility. That's what the Supreme Court said in Granite Rock. It's the court's responsibility to make sure that there is an agreement between the parties. And- Let me just ask you this. I think you've made all four of your points now. Is that accurate? I don't want to cut you off. Yes. I did want to return to the jurisdictional question that Judge Bevis had if I have time, but I- We'll let you do that. But I'm looking at 6203A now. And this says, no person shall engage or continue to engage in this commonwealth, and the rest of it, without the license or the permission. It doesn't say no contract shall be valid in this commonwealth unless the principal and so on have a license. So given that language and the focus on the person, why wouldn't our inquiry be focused on the assignee as opposed to the contract, the reported assignee as opposed to the contract? Because you said that the obligation goes with the contract, not with the person. Well, because with respect, Judge Mead, I don't think that Section 6203 is at issue. I think the provision of the CDCA that's at issue here is 6214I. And that says a licensee, that's one main, may not sell contracts, that's the loan or the note, to a person or corporation not holding a license under this act without the prior written approval of the secretary. So in 6214, the two key terms are contracts and licensee. And because one main did not follow that provision when it was reported to assign, that's where the violation is. My question actually doesn't support your argument. Given the difference in the language in 6203, one focusing on the person and one focusing on the contract, that would support what you're saying about the obligation goes with the contract, not with the person. I'm not sure if I understand. You're pointing out the distinction between the wording of 6214I, I think it is, and what I refer to as 6203. 6203 focuses on no person shall. And 6214 focuses not on the person or the contracting entities, but on the contract itself, which is your argument. So that distinction in the language between 6214 and 6203 actually supports your argument. I believe that's right. So I think there is a difference in the words that are used there. And in the Lutz case, there was a focus on 6203 and what the definition of a loan was. In this case, that originates within the CDCA. There's no dispute that this was a CDCA-covered contract. And I don't think there's really any dispute from Midland either that one Maine was a licensee, that there was no prior approval, and that Midland is not a licensee. And so 6214 was violated. The only way Midland sort of gets around that is by saying that if other provisions of the CDCA don't apply to Midland, then somehow that means 6214 wasn't violated. But it was one Maine who violated 6214. So I don't think that really helps Midland's argument. To very briefly turn to the Section 4 jurisdictional question, there are reasons, if you look at Arthur Anderson, which is a Section 3 case, as Judge Bevis correctly pointed out, to treat Section 3 differently from Section 4. Section 4 of the FAA seeks specific performance. That is the right it confers on the petitioner for arbitration. It's not simply a stay. And so if you look back to Chanfro Coal and Supply Company versus Westchester Corp and the Kula Kumpis shipping case from the Second Circuit that we talk about in our brief, there are reasons that Section 4 is a more limited remedy. The specific performance remedy is more limited, is not coextensive with Section 3. Section 3 of the FAA assumes that litigation has already commenced. And talks about what happens to stay that litigation. Section 4 is an entirely separate hypothetical. There is a dispute between parties that may or may not have yet led to litigation. But that dispute arises out of the contract providing for arbitration. While Section 3 just talks about an issue referable to arbitration under an agreement in writing, Section 4 speaks much more specifically about the two parties. The party who is aggrieved by the refusal to arbitrate, and the other party who is refusing to arbitrate. If you look at the state laws that were described in the Vaden versus Discover Bank case as virtually identical to the FAA, the Maryland statute discussed in Vaden, and also the New York Arbitration Act on which the FAA was modeled, those statutes are even clearer and more explicit in saying if one party to the agreement refuses to arbitrate, the other party to the agreement may seek specific performance. And so that is why Section 3 and Section 4 should be looked at differently because they do different things. One is about staying litigation. One is about specific performance of a contract, which in 1925 when the FAA was enacted was something only contractual parties could do. And the Second Circuit has already reached that conclusion that only contractual parties are entitled to invoke Section 4 in the Doctors Associates versus D'Estagio case, reaffirmed more recently in the Hermes of Paris versus Swain case. If there are no further questions, thanks for giving me the time. Thank you very much. I've got to say, Mr. O'Brien, when Ms. Burnett finished that, I thought to myself, wow, she's a tough act to follow. I feel sorry for Ms. Gilbride. I don't feel sorry for you anymore. I have no other to say thank you or uh-oh. Well, no, I'll say more when this is over, but the arguments are just incredible on both sides. A lot of interesting things raised, and we could argue for a very long time about this. But I think the overriding point that needs to be taken away from this is everything that we just talked about, all of the discussion about whether or not this assignment is void, whether or not this assignment is legal, whether or not this assignment is valid, whether or not Midland Funding can enforce the language in the arbitration agreement, or any aspect of this loan, for that matter, is something that Mr. Zerpli agreed an arbitrator would decide and not this Court because it's one of those threshold issues that has been delegated to an arbitrator. If we get to that point. Beg your pardon? If we get to that point. So I would submit to you, Judge McKee, that that's where we have to start because the assignment agreement, again, is an entirely separate ancillary agreement over here and under Rena Center and Henry Schein, where we begin is with the actual contract creating the agreement to arbitrate. Precisely because it's entirely separate. It's not an arbitrability issue. It's an enforceability issue. It's a validity issue. And all of those have been delegated to the arbitrator. I think that here's where the controversy lies. I was trying to think of an easy sound bite to give to your honors to sort of describe this. Mr. Zerpli is focusing on the validity of the assignment from Midland Funding to one main. But the FAA and the case law interpreting it, including the case law from this circuit, focuses on contract formation and not contract validity. And that is why the Supreme Court, when it heard the Buckeye case, it's important to keep that in mind. In Buckeye, the Florida Supreme Court had held that the contract creating this financial obligation was not just void but that it was illegal, that it was a criminally punishable contract. And it was on that basis that the Florida Supreme Court refused to enforce the arbitration agreement. And the Supreme Court said no, that we have to begin not with the legality of this contract that we're trying to enforce but with the question of whether the parties agreed to arbitrate. And regardless of what an arbitrator may... Look, it may come to pass that this case gets reversed. We go to AAA or JAMS and the arbitrator says, you know what, that assignment is not valid. You did not have a license. You did not have the permission of the Department of Banking. And you go straight back to court. And if that is the outcome, then that is what the parties contracted for because that's what the delegation provision would accomplish. I am out of time, but if you have any other questions, I'm happy to answer. Thank you very much, Your Honor. We'll ask for a transcript. And you can see this Reagan map. We'll take a brief recess here after this. And she didn't work out the details of the transcript.  that Ms. didn't pay for the cost of the transcript. Thank you.